Filed 7/31/26  In re David T.  CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re David T., a Person Coming Under the Juvenile Court Law. | B349795 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>D.L.,<br><br>        Defendant and Appellant. | Los Angeles County Super. Ct. No. 23CCJP02321A |

APPEAL from the findings and order of the Superior Court of Los Angeles County, Kristen Byrdsong, Judge.  Affirmed.

Ava Wallace, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

Mother D.L. (Mother) appeals the termination of her parental rights over her son David T. She argues that the trial court erred when it did not appoint a guardian ad litem (GAL) for her sua sponte. She contends the error was not harmless because a GAL would have argued more effectively on her behalf than her counsel did. We conclude that if the trial court erred, the error was harmless. We affirm the termination of parental rights.

## FACTUAL AND PROCEDURAL BACKGROUND

On July 12, 2023, the Los Angeles County Department of Children and Family Services (the Department) filed a petition pursuant to Welfare and Institutions Code[1] section 300, subdivisions (a) and (b)(1) alleging that on July 10, 2023, Mother brandished a knife at her son, 10-year-old David, and repeatedly swung the knife at the child resulting in cuts and bleeding to his hands, stomach and neck. On July 9, 2023, Mother attacked the child by jumping toward the child and attempting to strike the child with her hands positioned like a claw, causing David to run away from Mother. Mother stated she will hurt the child again by cutting him.

The petition also alleges Mother has mental and emotional problems "including paranoia, delusions, homicidal, with hallucination, manic, not medication compliant, danger to others, and bizarre and erratic behaviors" which render her incapable of providing regular care for David. On July 10, 2023, Mother was found sitting on the bedroom floor unresponsive and blankly staring at the wall. Mother was disorientated and was unable to

---

[1]     Statutory references are to the Welfare and Institutions Code.

2

make a meaningful statement. On July 10, 2023, and on a prior occasion, Mother was involuntarily hospitalized for the evaluation and treatment of her psychiatric condition. Mother failed to consistently participate in mental health treatment services.

Finally the petition alleges Mother was involuntarily hospitalized with an unknown release date and was unable to make a plan for the child's ongoing care and supervision which places the child at risk of serious physical and emotional harm, damage and danger.

A.     **Detention Hearing**

The detention report set out that on July 10, 2023, law enforcement, responding to a 911 call, arrived at the home where Mother was found in the bedroom on the floor conscious but unresponsive. Her 10-year-old son David was with her. Mother was taken to the hospital and put on a psychiatric hold. David was taken to the sheriff's station where he was interviewed by a social worker. He showed the social worker the cuts on his stomach, neck and left hand. He said Mother had attacked him with a knife, calling him "useless" and he did not know why. "She scared me." He put his hands out to stop Mother from swinging the knife at him and he was cut on his hands. David and Mother lived together; his father committed suicide when David was two months old.

David told the social worker he was scared of Mother and was fearful that she would use the knife on him again. This was the first time she had acted violently against him and she would not stop using the knife when he cried and told her to stop. He did not want the police to know Mother had attacked him as he did not want Mother to go to jail. The night before she had tried

3

to claw him and he ran away from her.  She later asked him to take a walk with her outside to get some fresh air.  David thought this was not normal.  He said Mother's doctor gave her some medication but he does not know if she is taking it.  He wanted to wait for Mother at the hospital but wanted someone to make sure she would not attack him again.

At the hospital Mother was interviewed by a social worker.  Mother stated she was fine and needed to leave.  She had mental health concerns when her husband committed suicide but she said she no longer has any mental health concerns.  Mother stated her doctor had given her sleeping medication which she had not taken.  Mother stated, "I made my son bleed but I tell you, I meant to do that, to push him away. . . . I need to get him away from me, so I can go up."  She did not clarify what she meant by "go up."  Mother stated people in China would know what that means.  The social worker asked Mother if she would like services to help her get her son back and Mother stated, "I'll think about it."

The next day Mother told the psych evaluator at the hospital that she felt "cutting the child was a good way to discipline."  She said she would "do it again."  The psychiatric progress notes from the 5150 hold state: "This is a 50 y/o Cantonese speaking female, she is brought in the ER after she attacked her son with a sharp object.  She is paranoid and delusional and danger to others."  Mental status exam indicated Mother was "disheveled appearance, uncooperative behavior, hyperverbal speech, anxious and manic in mood, person orientation, inappropriate affect, loose association in thought process, paranoid thought content, with hallucination, homicidal, and not medication compliance."  The recommendation was to

4

transfer Mother to an inpatient psychiatric unit once she was medically cleared as she was not safe to discharge.

On July 13, 2023, the juvenile court held a detention hearing, detained David from Mother and ordered him into Shelter Care under the supervision of the Department. Notably, as is relevant later in the Discussion section of this opinion, the court tried to coax David to take a piece of candy, a book and a teddy bear. He declined twice, until the court told him the gifts were free. The court permitted monitored visitation for Mother, three times per week for three hours per visit. David was eventually placed with foster parents.

B. **Adjudication and Disposition Hearing**

In preparation for the adjudication and disposition hearing, the Department prepared a report. David was again interviewed on July 30, 2023. Shortly after his birth, he and Mother lived in China for six years. They returned to the United States when he was about six years old. He said his usual routine was to get up, make his own breakfast, and go to school. Mother walked him to and from school daily. When he returned home, he did his homework, played, studied, ate dinner and went to bed. On occasion, he and Mother went to church on weekends. David said he wanted to go home with Mother whom he missed "sooooo much." He refused to talk about the cutting incident.

Mother was also interviewed on August 2, 2023. She stated she cut David because she had told him to stop and he did not listen to her, so she "cut him a little bit on the hand." She could not articulate clearly what David was doing at the time she told him to stop. Mother appeared "oblivious and non-understanding as to her mental health condition." She denied having a mental health diagnosis and said the only reason she had a mental

5

breakdown 10 years ago was because of her husband's death. She acknowledged that she is seeing a doctor and taking medication.

Mother was able to give accurate information on David's medical and dental providers and on his developmental milestones. She had no concerns about his academics and described him as a well-behaved, good child who listens well. The Department contacted several paternal relatives who all declined to provide shelter and care for David.

David's caregivers were interviewed. He was adjusting to living with them and their biological children who share a room with him and say he cries at night. He appeared very sheltered because when they took him to the beach and a museum, he told them this was the first time he had been to these places.

Mother visited David on July 24, 2023, and brought food for him. She had telephone contacts with him on August 2 and August 26, 2023. No concerns were reported.

The Department social workers advised Mother of the timeline for reunification services. Mother said she did not understand the advisement. She wanted to reunify with her son and the social workers advised her to comply with her medications and treatment plan. Mother nodded her head and said she would comply.

In its report, the Department concluded Mother's mental health disorders impact her ability to take care of her son. She had a crisis on July 10, 2023 and a mental health crisis 10 years previous when her husband died. The Department believed Mother needs mental health treatment and medication support for mental stability. "As of the writing of this report, there is no evidence the mother complies with medication and treatment as

she does not have a plan for ongoing treatment. The Department acknowledges the mother for taking proper care of David for the past 10 years, and that is evident by David's strong attachment and bonding towards her. Currently, the mother's mental health remain unresolved, and therefore, child safety concern remains." The Department recommended family reunification services for Mother and David and concludes that "it is imperative that the mother participates and complies with all mental health treatment and medications for her mental wellbeing and to mitigate any safety concerns."

On September 8, 2023, the court conducted an adjudication and disposition hearing. Mother was not present and her counsel advised the court that attempts to contact Mother had been unsuccessful. Counsel requested a continuance which the court denied. The court then entertained argument on the petition. Mother's counsel argued that the petition should be dismissed as the cutting incident appeared to be a one-off, there was no current risk because Mother was receiving psychiatric services, and no evidence supported the notion that a similar incident would occur in the future.

The court sustained the petition as pled on all counts. It found that Mother was refusing to respond to the Department's efforts to contact her and had shown an "inability to address her mental health and violent outburst at this time, as well as her hallucinations." It ordered David removed from Mother to protect David's physical health. It confirmed David's current placement, ordered family reunifications services for Mother and David and ordered the Department to review the case plan with Mother, and to provide Mother's therapist with copies of the sustained petition and all court reports.

## C.    **Six-Month Review**

The Department prepared a status review report for the juvenile court.  It advised the court that David remained with his foster parents.  He wanted to reunify with Mother, saying Mother "is the best mother in the world."  Otherwise David had adjusted and adapted well at his placement.  He felt good and safe there, had a good relationship with the foster parents and their children, and enjoyed going to the beach with them.  He reiterated that he enjoyed visiting and spending time with Mother.  He loved her cooking and he was excited about playing with Mother at the beach.  He would comfort Mother when she appeared to be sad or crying.

David was described by his school as cooperative, a pleasure to work with, and liked by his peers.  His emotions appeared to have stabilized with the help of the foster parents and his therapist.  He built a rapport with his therapist who was teaching him to use coping skills to deal with emotional stress and his separation from Mother.

Mother stated she wanted David to come home to her and asked often when he could return home.  She was confused why David had been removed from her care and she repeatedly asked what she needed to do to reunify with David.  The social worker and Mother's therapist and case manager repeatedly explained to and reminded Mother what she needed to do.  She had been ordered to attend a parenting class, for which she was deemed not capable due to her mental health condition.  She had been ordered to receive a psychiatric evaluation and take all prescribed medications.  She was evaluated, but declined to take the prescribed medication, even though she continued to have visual and auditory hallucinations.  She had been ordered to

attend anger management and had not yet been deemed suitable to attend the class. Finally, she was ordered to receive individual counseling to address case issues. Mother attended counseling on a weekly basis through the end of 2023, but was a no-show for her sessions on January 22 and February 5, 2024. Her therapist stated he might end services for Mother if she missed another session.

During their time together, Mother would kiss and hug David. She could engage in a conversation and interact with David; however, she sometimes would disengage, walk away from David, and appear disoriented. She would remain quiet. At other times she would laugh to herself suddenly for no reason. She also had episodes of mood swing. She would raise her voice and yell or blame David sternly. David appeared shut down by Mother's yelling and he cried on a couple of occasions. The two appeared to have a close relationship with each other and Mother told David she loves him and wanted to reunite with him. Mother would tell David to tell his attorney and the judge that he wanted to go home with her.

The status report concluded in boldface: "During this period of supervision, the mother repeatedly asked what is needed for her child David to be back with her. **At times, she appeared to be confused as to the reason that led to the removal of David. At times, she would apologize to David, as it was her 'fault that led to the current situation.' She stated that she was a bad mother, and she would not be able to get David back with her. At times, she stated that she was being targeted, and thus, she could not get David back with her no matter what she did.** The mother's therapist, case manager, and CSW have repeatedly gone over the court-

ordered case plan and explained to the mother what she needed to do to reunite with David. From time to time, the mother would ask what she needed to do again. **At the initial stage of the case, CSW needed to actively connect the mother with her counseling agency because she did not answer nor return calls. With the help of the mother's friends, the mother started to receive counseling services on 10/17/2023 and psychiatric services on 12/19/2023. The mother's friends accompanied the mother to her counseling sessions. They also reminded the mother repeatedly for her appointment with the psychiatrist. Per therapist Mr. Yau, the mother has had two no-show[s] to her counseling sessions since her friends had stopped accompanying her at the end of 2023. Although the mother has told her psychiatrist that she has been taking the prescribed psychotropic medication, she also told her therapist Mr. Yau and case manager Mr. Chan that she did not take the psychotropic medication because she did not have any mental problem and she did not feel good with the side effect of the medication, respectively. The mother's mental state appeared to be unstable, as evidenced by her report of ongoing visual and auditory hallucinations, her mood swing during the Family Time with child David, her withdrawal during the Family Time with child David, and her inappropriate affect during the Family Time with child David.** The mother has yet to enroll for parenting class or anger management class, as she was deemed not suitable to participate under her current mental state. Based on the mother's little progress on her mental stability and Court-ordered programs, the Department believe[s] that there is a substantial

10

risk of neglect and/or physical or emotional harm over child David if he is to return to the care of the mother at this stage. Due to the mother's current mental state and a lack of social support, there is not a substantial probability of child David returning home to the mother by 09/06/2024."

The report continued: "**Throughout this case period, the mother did repeatedly state her wishes to reunite with David, but she also had episodes when she stated she could not get David back with her because she was being targeted. She has failed to acknowledge her mistake, and more so, she appeared incapable of gaining insight over her mental health issues. She has provided contradicting statements over her use of psychotropic medications. It is difficult to prove whether the mother has taken her medications, but based on her symptoms like visual and auditory hallucinations, laughing to self, and withdrawal while she was with David, it did appear that her mental state has been unstable. Due to her lack of insight of her own mental health needs, the mother possesses a significant level of risk when she is with David. It would be a similar situation like that [which] led to the involvement of the Department. David would be at risk of negligent act from the mother, and his emotional and physical well-being would be in jeopardy if he is to return to the mother at this stage.**"

The Department recommended an extension of reunification services for Mother because of its concern over Mother's capability to care, provide and protect David properly and safely.

On March 7, 2024, the court was prepared to conduct a six-month review hearing. Mother was not present. Mother's counsel wanted to contest the Department's report. The hearing was continued to March 25, 2024.

On March 25, 2024, Mother's counsel argued that she was "asking for a home-of-parent order today. Mother believes she is able to appropriately parent David. It is my understanding that David would really like to return home as well. Mother and David have very good visits and there have been no noted safety concerns. [¶] Mother would like the court to know that she really misses David, and they have an incredibly strong bond." The Department and minor's counsel argued that a change of placement was not warranted given that Mother's mental state continued to be unstable and she had not yet addressed case issues. She was not taking her prescribed medications as she did not think she has any problems, despite reporting visual and auditory hallucinations.

The court found by clear and convincing evidence that David's return to mother would create a substantial risk of detriment to him, creating a continued necessity for and appropriateness of the current placement. The court also found Mother's progress "unsubstantial" but continued reunification services for her. It found that "Mother needs more time to address her mental health and address case issues and demonstrate an understanding and an ability to address these issues."

D. **12-Month Review**

In preparation for the 12-month review, the Department advised the court that Mother had "numerous no-shows" to her counseling sessions. She had her last counseling session over the

12

phone on August 19, 2024. She has not seen her psychiatrist since May 7, 2024. Her therapist and case manager had a difficult time contacting her. She did not take any of her psychotropic medication because she felt she did not need it. She did not complete the screening for the parenting class. During her family time with David, she could engage in a conversation with him. However, she would disengage, walk away from David and appear disoriented. It happened more often than not in the most recent month of August. On August 25, 2024, Mother was by herself for almost half of their time together. She did not communicate or interact with David. She cooked food for him, and they ate separately. David ate in the room watching videos on his laptop while Mother ate by the kitchen countertop. Mother continued to say she wanted to reunite with David.

The Department advised the court in boldface: "**It is to note that the mother has stayed at home with David more often than not in the past two months. It was observed that the mother has been to herself more than in the past. She would stare at a point and she would not move nor engage with David. The mother appeared to have such 'episode' for a longer time and more often in the past month. On 08/11/2024, the mother spent more than half of the Family Time sitting in bed by herself or star[ing] out a window in the kitchen or living room. On 08/17/2024, David observed the mother putting up the mattress to the side of the bed when he arrived at the mother's residence. He asked the mother about it, but she did not respond to David, and she star[ed] at the laptop. David asked the mother what had happened, and he asked the mother to talk to him. The mother looked on and remained silent.**

13

After David had asked repeatedly, the mother told David not to speak. David reached out and asked the mother to move and talk instead of staying still and looking on. The mother told David not to touch the items on the small table while she was looking at it. David prompted the mother to talk to him repeatedly, as he appeared to be concerned of the mother. After a couple minutes, the mother told David to keep quiet. David reached out again and held onto her hands. David told the mother that it was not good for her to stay still and look on. He continued to explain to the mother while she told him to walk away. They went back and forth until the mother slapped on David's left thigh. CSW Lee told the mother not to hit David. David walked away and played his LEGO by the small table. He started to cry. The mother looked on and sat at the edge of the bed. After a few minutes, the mother remained sitting still while David continued sobbing. David then reached out to the mother and stated his concerns to her. He asked, 'Why you have become such a mother, MaMa? You were a very kind mother before, but you have got a bad temper now? You blamed me. You just looked on and did not talk to me? That's not good for you. You cannot just stay still. You need to move. You cannot keep thinking.' The mother smiled and said that David should mind his own business. He should play [with] his toys and she would do her thinking. She said that David should not interrupt her. David said he cared about her, so he needed to communicate with her. He said if he did not care, he would not come visiting. He visited her because he loves

14

her.  David sat on the mother's lap[] and hugged her.  The mother said she needed to do her thinking, and David should leave her alone.  She then told David to stand up, as she needed to use the bathroom.  The mother walked out to the living room and stood still looking on.  David went out and saw the mother standing by the front door.  He then returned to the room and watched videos.  On 08/25/2024, the mother spent more than half of the Family Time sitting still in bed and star[ed] at the floor.  She did not talk nor interact with David until the last hour of a six-hour visit. . . . David has cried a few times during his Family Time with the mother on 09/03/2024.  It was due to the mother's unstable mental health state. [¶] It appeared that the quality of the Family Time has deteriorated sharply in the past month.  It appeared that the mother's mental health challenges have gotten worse during this past case period, due to a lack of treatment.  The 'frozen' moments of her not engaging David have happened more frequently and for an extended period of time.  It has negatively impacted the mother's interaction and relationship with David.  It has also led to David's emotional instabilities, as evidenced by his crying episodes during or at the end of the Family Time."**

The Department recommended that due to Mother's lack of progress on her mental stability and court-ordered programs, there was a substantial risk of neglect or physical or emotional harm to David if he returned to the care of his mother.  Because it felt the quality of their time together had deteriorated, the Department recommended that they see each other only one time per week for two hours.  The Department also recommended

15

terminating reunification services for Mother and it would assess permanency planning for David.

At the 12-month review on September 23, 2024, Mother and David requested a contested hearing on the issue of terminating reunification services. Before the hearing date, the Department filed a "Last Minute Information" report to advise the court of another incident on October 5, 2024, when Mother spent most of the time with David sitting on the edge of the bed, staring. David pulled Mother up from the bed and pulled her to the door of the room. She returned to sit in bed. She ignored David's requests for something to eat and appeared to be occupied. The monitoring social worker watched David make himself a meal. He asked Mother if she wanted something to eat. She continued to sit in bed. She began to wave her hands in the air. She did not engage with him, even when they drove to In-N-Out Burger to get something to eat. Mother appeared "significantly occupied" and unable to focus on David. (Boldface omitted.) It was noted that on October 12, 2024, Mother had dragged David up from where he was sitting on the floor, hurting his hand. Mother only stopped when the social worker intervened. The Department concluded that not only was her ability to interact with David deteriorating but also her capability to manage her own care was in question.

On October 22, 2024, the court held a contested 12-month review hearing. Mother was not present. Her counsel requested a continuance because he had not been able to get in touch with Mother. The request was denied. Mother's counsel asked for services to continue for his client. "Mother has clearly engaged in services. The report documents that she's participating in individual counseling. While it does note that she has missed

16

some sessions, she is engaged in counseling. Mother has also been screened for parenting. Although she's expressed some reluctance to proceed, she has enrolled in parenting. [¶] . . . This is a mental health case and Mother's conduct is consistent with the sustained allegations, which she is mitigating through her individual counseling and parenting and the case plan services that she will be able to take in the future when ready." Finding Mother's progress "satisfactory," the court continued reunification services and set another status review for January 22, 2025. The court found: "Mother is addressing some case issues. She definitely needs time to address her untreated mental health, her current hallucinations, her current inability to care for David. [¶] The court will allow her to have three more months. It's possible if she avails herself of all of the recommended services, she can be in a position to reunify with David." The court ordered Mother's visitation to remain the same if the next two visits went well.

E.     **18-Month Review**

The Department noted in its status review report to the court that "Mother did not continue mental health treatment and continues exhibiting psychotic symptoms during the family time. Mother continues hallucination and [delusion] behavior by talking to self without proving of the person whom she interacts with. Mother also lacks interaction with David and not very responsive to David's requests observed by the monitor during the visits." "David tries to interact with mother but her response was limited which triggered David's emotions negatively. David has excessive worries about his mother who does not want to receive mental health treatment. David expressed guilt that he can't take care of his mother when she is not feeling well. Even

though mother and David ha[ve] a close bond but mother's abnormal reaction and behavior have caused negative impact on David emotionally. David would cry and did not want to leave the home after the visit. The emotional burden to David is beyond his emotional capability of age to absorb; therefore, reduced . . . family time appeared to be in the best interest of David." The Department noted that "David previously stated he wanted to go home to his mother and that his mother treated him well, and he wanted to live with her. On 12/14/2024, child David shared that he feels safe to stay with his current resource parents if his mother is not able to get well to take care of him at this time."

Mother continued to state that she did not know what she needed to do to get her child back with her. She had numerous no-shows to her counseling sessions. She still had not seen her psychiatrist since May 7, 2024. She was not taking her medication because she felt she did not need it and had yet to enroll in parenting or anger management classes because she was deemed not suitable to participate under her current mental state. She also declined a third parenting class screening.

The Department concluded: "Throughout this case period, the mother did repeatedly state her wishes to reunite with David, but she also repeatedly asked about services the court has ordered upon her. Due to her lack of insight of her own mental health needs, the mother possesses a significant level of risk when she is with David. The risk level has not be[en] decreased since the case came to the attention of the Department. David would be at risk of negligent act from the mother, and his emotional and physical well-being would be in jeopardy if he is to return to the mother's care. It appeared that the mother's mental

18

state is a significant factor that prevents the progress of the family's reunification.  The Department could not envision the mother to improve on her condition due to lack of treatment.  In the past year of case period, the mother's mental state appeared to have deteriorated to the extent that the mother could not engage David with quality time." (Boldface omitted.)  The Department recommended terminating reunification services for Mother and assessing a permanency plan for David.

The Department updated its report on visitation on February 20, 2025.  It advised the court that Mother continued exhibiting hallucination and delusion symptoms during the visits.  She is not responsive to interact with David and sits at a place quietly and seems to engage in a mental activity with some voices.  Mother would utter some statements that do not match the scenario.  David would ask Mother whom she was talking to but she did not respond.  David was upset about Mother's response.  "The quality of the visitation was poor."  David advised the social worker he knows that Mother cannot take care of him at this time and he hopes she will receive treatment and get better so he can return to live with her.  None of his family members showed interest in providing permanency to David.  His current caregivers were willing to adopt him.

After continuing the hearing for four weeks at Mother's request, the court conducted the 18-month review on February 25, 2025.  Mother was not present and did not pick up her phone when called by the clerk.  Mother's counsel asked for another continuance because he had not been in touch with Mother.  He pointed out Mother "had a limited ability to complete her case plan."  The court denied the request.  It found Mother's progress "unsubstantial."  The court noted Mother "repeatedly

19

demonstrated an inability to address case issues, an inability to address her untreated mental health issues. She's continuing to exhibit very concerning behavior during the visits, including hallucinations, talking to the air and not really interacting with David." It terminated reunification services for Mother and set a permanency planning hearing for June 24, 2025.

F.    **Section 366.26 Permanency Planning Hearing**

On May 20, 2025 and June 6, 2025, the Department filed Declarations of Due Diligence setting out its unsuccessful efforts to locate Mother who had disappeared around late February 2025. Mother had moved out of her home and did not notify the Department of her current address or whereabouts. As of March 13, 2025, her cell phone was no longer in service.

On August 29, 2025, the Department provided another status review report. Mother's last visit with David was on February 18, 2025. After that her whereabouts were unknown until July 30, 2025, when Mother contacted the Department to request a visit with David. David agreed to visit with Mother but admitted feeling anxious about seeing her. The visit occurred on August 13, 2025. Mother "appeared to be impatient and redirected the conversation with David when David tried to express and share his religious beliefs with the mother. David reported that he enjoys his visit with mother and would like to continue with the visit." On August 13, 2025, David stated he would like to continue to live in his current home and only visit with Mother. He stated that he loves his current family and feels he is part of the family. He does not want to tell Mother that he would like to remain in the foster home because he does not want to see her sad. He agreed to be adopted by his foster parents.

On September 16, 2025, Mother filed a petition to reinstate reunification services under section 388 because "David deserves a meaningful opportunity to reunify with a stable parent, and mother is engaged in services that will allow for reunification." Mother told the court that she had completed a mental health evaluation and is participating in treatment including three sessions of individual therapy. She also began attending parenting classes on August 22, 2025 with no absences. The court set the petition for a hearing and ordered the Department to "provide counsel and the court with an update as to whether these services are helping Mother to appropriately interact with David as she used to in 2023." When the Department objected and argued no change in circumstances, the court responded: "I disagree. What if she's getting the help she needs to be able to interact with David? I don't know that and I'd like to know that."

The Department opposed the section 388 petition. Mother had told the Department that she went to China because the maternal grandparents had a medical crisis and needed support. Mother stated upon her return she rented a room in a house for $600 per month. She shared the house with the landlord and the landlord's elderly mother. They all attended the same church in Torrance. She currently participated in weekly virtual parenting education, individual counseling and recently enrolled in an anger management program. She stated she is learning to manage her emotions and self-care. She denied taking her prescribed medication. She stated she has been feeling fine and still does not understand why David has been in placement for over 27 months. She stated her mental health was stable and she denied hallucinations, paranoia, or self-harm ideas. When

21

told David was happy with the current caregivers, Mother stated that David is her son and he needed to be with her.

On October 3, 2025, David was interviewed. He reported he had been having weekly family time with Mother. He "described the visits as fine but strange. He said Mother [was] repeatedly telling him about the way he was sitting. Furthermore, he felt awkward and uncomfortable about the mother telling and pressuring him to tell the Department that he wants to reunite with her." David stated he does not feel safe with Mother, does not want to reunite with her and stated "No, I want to stay here." (Boldface omitted.) He continued to say that he wants the caregivers to be his adoptive parents so he can live with them until he grows up.

During his visit with Mother on September 25, 2025, she told David more than 10 times to tell his attorney he wants to come back. She tried to give David a piece of paper with her address on it, but David did not take it and told the monitor about it afterwards. After the visit David said he was fine and was not bothered by Mother's behavior.

On October 14, 2025, the court heard argument on Mother's section 388 petition. Mother was present. Her counsel argued "Mother demonstrated a change in circumstances. In the Department's 388 report, they note that Mother has been engaged in five sessions of parenting. She's been engaged in individual counseling since August. She's been engaged in anger management, completing three sessions, since Mother had first enrolled when this 388 was filed. This level of participation in the last two months is a stark change from the conduct that occurred when Mother's family reunification services were. [¶] . . . [¶] This is a stark change from Mother's conduct. When her

family reunification services were terminated, Mother was largely unresponsive and disengaged from her case plan and during visits. [¶] With regard to the second prong of the minor's best interest, it's very clear that David has been firmly attached to Mother and his suffering early in this case was evident at Mother's lack of responsiveness.  In the most recent visits, Mother is engaged with David.  They have mentioned in a 388 report, Mother asking repeatedly about David's intention to return to Mother.  And I certainly have counseled her on discussing case issues. [¶] What is very clear with regard to the visit is that Mother is actively concerned with David, that she's very much aware of his preference, that he was a priority in her life and that commitment, the level that she's demonstrating, I do believe David is a little reluctant to understand just as he didn't understand when his Mother was disengaged.  He's young and doesn't necessarily understand the mental health picture. [¶] What I'm asking today is for Mother to be given a period of family reunification where she can complete these services that she is obviously actively engaged in at this time, that Mother can continue to visit with David and not to discuss case issues but discuss David's life and interest and support him, which she has a strong desire to do.  Through services, she should be able to develop the skills that she needs to maintain a proper focus in her son's life. [¶] Frankly, her level of action in the last two months implies she will continue to do that and I believe that's a benefit to David and it's in his best interest to give him an opportunity to reunify with a loving and stable Mother."

Counsel for David and for the Department acknowledged Mother's new engagement in services, but both opposed reinstating reunification services.  David had expressed a desire

23

to remain with his current caregivers and to be adopted by them. The Department noted her unexplained and sudden absence from the country and her recent requests to David to tell the court about his desire to return home, without asking him if he indeed wanted that outcome.

The juvenile court denied the section 388 petition finding no change in circumstances. The court stated: "[I]t does not seem she's learned or benefited from [services], given her most recent behavior . . . describing Mother as making David very uncomfortable during the visit, focusing on how he's sitting and David, himself describes her behavior as strange, and the fact that 10 times she's trying to encourage David to break the rules of visitation, take down her number, which she wrote on a piece of paper and trying to give him her number, trying to repeatedly coach him to tell his attorney that he wants to return home. [¶] All of this badgering . . . , not even asking David what he wants or how he feels and the fact that she was gone from February to August, she clearly has not benefited from the services. If anything, she's in the process of hopefully benefiting from those services. Given that David does not want to return to her care, given that he doesn't feel safe with her or stable because of her very concerning behavior, given he wants to remain with the caregivers where he's thriving where he feels stable. He's honestly like a different person. [¶] The court remembers vividly when he appeared in this court, he was so timid and scared. He didn't even realize he could take a piece of candy and a book. For all of these reasons, the court does not find either prong of the 388 has been met. And for those reasons, it is denied."

The court then proceeded to the issue of terminating Mother's parental rights. Mother's counsel argued: "She has

24

been impaired in visiting by her mental health condition, which she returned to China to address. Her return from China clearly shows, as the court indicated, changing circumstances. I would put forward that the impact of her being absent was to address a medical need. Mother has visited as able, again, as confined by the medical need associated with her mental health."

The juvenile court found no applicable exception to adoption, determined by clear and convincing evidence that it would be detrimental to the child to be returned to Mother, and terminated Mother's parental rights. The court found appropriate the permanent plan of adoption.

This appeal followed.

## DISCUSSION

### A. Applicable Law and Standard of Review

In any proceeding where an incompetent person is a party, the person must appear through a GAL appointed by the court. (Code Civ. Proc., § 372.) GALs stand in the place of the incompetent parent and assist counsel in making tactical decisions. The foremost consideration of a GAL is the interest of the incompetent parent. (*In re M.P.* (2013) 217 Cal.App.4th 441, 460.)

The test for incompetency in a dependency case is whether the parent has the capacity to understand the nature or consequences of the proceedings and to assist counsel in preparing the case. (*In re James F.* (2008) 42 Cal.4th 901, 910.) Alternatively, if the parent is unable to provide properly for his or her personal needs for physical health, food, clothing or shelter, appointment of a GAL is warranted. (*Id.* at p. 916.) The

25

incompetent parent then cedes management and control of the litigation to the GAL. (*Id.* at p. 904.)

The circumstances under which appointment of a GAL for a parent in a dependency proceeding may occur may vary widely from case to case. (*In re Sara D.* (2001) 87 Cal.App.4th 661, 671.) Once the juvenile court has knowledge of a parent's incompetency, the court has an obligation to appoint a GAL sua sponte. (*In re Lisa M.* (1986) 177 Cal.App.3d 915, 919.) A parent may challenge on appeal the juvenile court's decision not to appoint a GAL even if the parent did not raise the issue in the juvenile court. (*In re A.C.* (2008) 166 Cal.App.4th 146, 155–156.)

We review a juvenile court's decision not to appoint a GAL sua sponte under the abuse of discretion standard of review. (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.) Discretion is abused when a decision is arbitrary, capricious or patently absurd and results in a manifest miscarriage of justice. (*In re Karla C.* (2003) 113 Cal.App.4th 166, 180.) Appellant has the burden of proving abuse of discretion; error is not presumed. (See *People v. Picazo* (2022) 84 Cal.App.5th 778, 802.)

If a parent is able to affirmatively demonstrate that the juvenile court abused its discretion in not appointing a GAL, we next consider whether the error was prejudicial to the parent, that is, whether a different result would have been probable had the error not occurred. (*In re A.C.*, *supra*, 166 Cal.App.4th at p. 159; *In re N.J.* (2024) 104 Cal.App.5th 96, 127 [in assessing whether an error is prejudicial, we ask whether there is a reasonable probability of a different result absent the error].) A finding of prejudice must be based on a claim of prejudice rather than speculation of possible prejudice—because it is simply inefficient to reverse a dependency judgment based upon

26

speculation that an offending parent may have handled the case differently than his or her GAL. (*In re Esmeralda S.* (2008) 165 Cal.App.4th 84, 96.) Similarly, speculation of possible prejudice because a GAL may have influenced counsel to handle the case differently is no basis to reverse a dependency judgment.

B.    **Analysis**

Mother contends that after the court was put on notice of her mental illness, three important hearings occurred: a section 366.22 hearing on whether reunification services should be terminated; a section 388 hearing on Mother's petition for resumption of reunification services based on changed circumstances and the best interests of the child; and the final section 366.26 permanency planning hearing. Mother argues that had a GAL been present at each of these hearings, Mother's position would have been better explained to the court. She argues that at the section 366.22 hearing, "a GAL would have aided Mother's counsel in arguing more vigorously on her behalf and explaining that her 'limited ability to complete her case plan' was really her debilitating mental illness that left her detached from reality and those she loved." At the section 388 hearing, a GAL "would have emphasized that after months of worsening hallucinations and disturbing mental health symptoms, the positive visits with David with no evidence of hallucinations as well as participation in treatment were certainly changed circumstances." Finally at the section 366.26 hearing, a GAL would have "ensured that counsel and the juvenile court understood that Mother's apparent noncompliance, disengagement, and absence were not a matter of indifference to the proceedings, but symptoms of her mental illness that prevented her from grasping what was required of her."

27

Assuming without deciding that the juvenile court should have appointed a GAL, we conclude any error was harmless. First, all the argument and conclusions Mother contends a GAL would have proffered to the court were in the Department's reports in bold lettering and were argued to the court by Mother's counsel, as our summary of the proceedings shows. The record reflects that the court, the Department, and counsel were all well aware of the impact Mother's mental health issues were having on her and on her son. The transcripts of the hearings show that every participant in David's case acted with empathy for Mother's illness and her recovery efforts. Mother has not suggested any argument or contention that her counsel omitted or failed to bring to the court's attention. Nor does Mother argue that counsel in some way waived or compromised her rights or did not ensure that the juvenile court had all the facts straight. Nor could Mother make such an argument as the record reflects that at every inflection point, Mother's counsel continued to advocate on her behalf to persuade the court to give her more time to recover from her illness. Indeed, Mother suggests only that counsel's argument would have been better if he had been guided by a GAL. We do not agree.

As to the juvenile court, Mother points to no particular judicial statement, action, or conduct that would lead anyone to believe the juvenile court did not have a command of all relevant facts. Neither does Mother argue that the facts before the juvenile court were in error. In short, Mother participated in the proceedings through her counsel who advocated for her on exactly the same issues she contends a GAL would have raised on her behalf. And the court, recognizing her illness, gave her numerous opportunities to start her recovery. It finally terminated her

parental rights when it became apparent that David's need for stability outweighed any benefit he received from his deteriorating relationship with Mother.

Second, under these circumstances there is no reasonable probability that the juvenile court, or any juvenile court, would not have terminated Mother's parental rights when it did. After 18 months of reunification services and several months where Mother disappeared without a trace and without advising anyone, including her son, the court, the Department, counsel, her service providers, and her son's foster parents of her whereabouts, Mother's mental health improved or worsened on a month-to-month basis. She appeared at times to be adhering to her treatment protocols and at other times, to be in denial about the necessity to treat her illness. She continued to insist, after 18 months into the proceedings, that she did not understand what she had to do to get her son back and why she had to do it. Similar to the parent in *In re Daniel S.* (2004) 115 Cal.App.4th 903, 913, she appeared unable to process anything.

There was no alternative but to remove David from her care. Mother had a mental illness that disabled her from participating in reunification services, she was not taking her medication, and she had been involuntarily hospitalized because she was a danger to herself and others. She continued to assert that she would cut David again as she thought it was appropriate discipline. Maybe she would not have stabilized on her medication, but we do not know because she would not take it. She posed a physical and emotional danger to her son, who was well aware of that danger and was afraid of being returned to her. Under these circumstances, there is no universe in which a court would have returned David to Mother and would not have

terminated her parental rights.  Mother was not prejudiced by the trial court's failure to appoint a GAL on her behalf.

Inasmuch as Mother was never ready to assume custody of David due to her mental condition, we cannot think of any conceivable additional testimony, facts, or argument Mother could have presented that would have altered the juvenile court's decision to terminate her parental rights.

## DISPOSITION

The findings and order of the juvenile court are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, P. J.

We concur:

VIRAMONTES, J.

SCHERB, J.

30